## Board Of Park Com'rs Of Ashland et al.
## v. Shanklin et al.

February 14, 1947.

Watt M. Prichard, Judge.

44

John C. Vigor and A. W. Mann for appellants.

Howard Van Antwerp, Jr. for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming in part, reversing in part.

The City of Ashland is fortunate in having acquired long ago a tract of 47 acres as a public park in what is now a fully developed part of the city. It is known as Central Park. It has virgin trees and some Indian mounds and has been developed with roads, paths, pools and other recreation facilities which contribute to its enjoyment by all the citizens. Baseball diamonds with open seats have existed in the northeastern part of the park for many years. They have never been commercialized, but open for everyone. Occasionally the park has been used for various sorts of public entertainment, for some of which charges of admission have been made.

The Board of Park Commissioners is proposing to enclose that part of the park as an athletic field and to erect a modern, artistic stadium with a seating capacity of 2,000, and to enter into contracts for its use and operation by the Ashland Baseball Club, which controls a professional team, the Ashland High School Athletic Association, the local post of the American Legion and the local chapter of the Order of Elks. This suit tests the authority of the Board to do so. It presents questions of the legitimacy of that use of the park and of the validity of the proposed contracts. An intervening petitioner charges that the operation of the ball park with flood lights in the night-time would be a nuisance, and for himself and other nearby property holder seeks an injunction to prevent it.

The city has fee simple title to the property. No record has been found of any formal action by its council dedicating it to park purposes, but from the beginning it has been designated, maintained and used as a public park in every sense of the word. There has been manifested a clear and unequivocal intention to devote this property to park purposes only. It must therefore be regarded as having been informally or impliedly dedicated with a result just as effectual. Massey v. City of Bowling Green, 206 Ky. 692, 268 S. W. 348.

The uses to which park property may be devoted depend to some extent on the manner of its acquisition; that is, whether it was granted and dedicated by individuals for the purpose or purchased in fee by the municipality. In the latter case the use is regarded as less definitely defined and a more liberal construction as to the consistency of the use for various purposes is adopted. City of Hopkinsville v. Jarrett, 156 Ky. 777, 162 S. W. 85, 50 L. R. A., N. S., 465; 39 Am. Jur., "Parks, Squares and Playgrounds," section 21; 44 C. J. 1101. The decisions of other courts as to the legitimacy of the erection of stadiums and other structures and their commercial operation by park boards are not in accord, probably because of the different terms of the statutory authorities and of the particular titles. Annotations, 18 A. L. R. 1247; 63 A. L. R. 484; 144 A. L. R. 486. It was held in South Carolina that the building of a stadium and athletic field was not a consistent purpose. Miller v. City of Columbia, 138 S. C. 343, 136 S. E. 484. But the opposite was held in Missouri. Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S. W. 2d 332. Under our conclusion as to the illegality of the proposed contracts it is not necessary that we should express an opinion on this point.

The same is true as to the contention that the operation of the ball park at night would be a nuisance per se. However, we may call attention to our recent opinion holding that it would not be. Board of Education of Louisville v. Klein, 303 Ky. 234, 197 S. W. 2d 427.

We summarize the proposed contract with the Ashland Baseball Club. The others are substantially the same. Following a preamble as to the proposed use of the designated part of the park for baseball and other athletic purposes and as to the desire of the Board of Park Commissioners to afford better facilities for the comfort and enjoyment of the people, and its purpose or desire to erect the stadium and appropriate appurtenances, the Board agrees to give the Club the "exclusive use" of the proposed athletic field and facilities "at such times and for such purposes as it shall deem to the best interest and benefit of those persons using Central Park," but with the provision that the Board shall "at all times retain control and supervision over said area." The Club will formulate schedules of ball games in ad-

vance and the Board will cooperate in determining those schedules. It will permit and may require the Club to collect admission fees according to agreements to be made from time to time. The Club will pay to the Board a percentage of the fees or a specified sum for each ticket or a flat sum for the use of the facilities. The choice is optional with the Board and the amounts to be charged and paid to it must be agreed to. Certain details are stipulated as to the Club preparing the tickets, keeping accounts, making reports, policing and cleaning up the grounds, carrying indemnity insurance and other matters which are not especially material. The Board reserves the right to the concessions. The contract could be terminated by either party upon notice.

The Board of Park Commissioners of Ashland is established by the statutes and derives its authority direct from the Legislature. It holds the property for the municipality, which has title to it in trust for the use of the public. The statutes declare that, "All public parks established and maintained for the recreation, pleasure and welfare of the white" population "shall be held, managed and controlled by a 'Board of Park Commissioners (White)' of the city wherein the parks are located." KRS 97.400. The members are appointed by the mayor and each must take an official oath and execute bond for the faithful performance of his office "without favor or prejudice." KRS 97.410. It is further provided that, "The boards shall have the care, management and custody of the parks and grounds used for park purposes * * * or public squares by the city or board." Certain specified duties are thereafter enumerated, which but emphasize this general provision. KRS 97.440. The statute also specifically declares that such parks within the management of the board shall include "all buildings, structures, improvements, seats, benches * * * and other things thereon and enclosures of the same; all * * * playgrounds necessary and incidental to such public parks and property." KRS 97.510. The maintenance of parks by a municipality is a governmental function. City of Louisville v. Pirtle, 297 Ky. 553, 180 S. W. 2d 303.

The grant of public power and right imposes a corresponding public duty and responsibility. Official dominion and discretion may not be surrendered, nor public functions delegated, in whole or in part, to another

person who is not answerable to the people. There is an implication not only of the withholding but of the prohibition of the exercise of other authority not necessary to the performance of that which is expressly given. Of such is the shifting or sharing of the powers granted or duties imposed. Booth v. City of Owensboro, 274 Ky. 325, 118 S. W. 2d 684.

It seems to us that the proposed contracts would in effect give to the various clubs the right and power to exclude the general public from the use of a substantial part of the park for an indefinite, although extended period of time. This would not be consistent with its free public use. The Board would surrender its sole and exclusive control of the management of this part of the public property. Its dominion and administration would be less than absolute. It is true there is a provision that the Board shall retain control and supervision of the area, but that general reservation must be deemed qualified by the specific provisions. It would bind itself to agree reasonably with the clubs upon the details, for it could not arbitrarily refuse and thereby deny the rights granted them by the contracts.

In Booth v. City of Owensboro, supra, we held that the City of Owensboro and County of Daviess could not enter into a contract with a private charitable corporation for the erection and management of a hospital, since it would be to share the public responsibility, although the actual operation of the hospital would be lodged in the city and county. The statutes governing the subject matter and the functions of the public agencies are not materially different from those controlling the Board of Park Commissioners of Ashland. Many cases of similar character are cited in support of the conclusion.

Of particular application is Board of Park Commissioners of City of Louisville v. Speed, 215 Ky. 319, 285 S. W. 212. A contract by which the Board of Park Commissioners granted to a statutory memorial commission the right to construct, control and operate a memorial auditorium in Central Park of that city, subject to the reservation of a designated portion of the building for park facilities and purposes, was held invalid. By that contract the Board of Park Commissioners abdicated and undertook to surrender in perpetuity the entire con-

trol over one-fifth of the park committed into its hands, subject to its limited use of a part of the building. By the present contracts this Board would surrender not so much but a considerable degree of control over one-tenth of the property committed to it. In the Louisville case the contract would have shifted authority to another governmental agency, while in this one the proposed contracts would divide governmental authority and responsibility with private parties having no public obligation. It would seem that the proposed contracts were drafted with the view of avoiding the vice in the Louisville contract and the basis upon which the decision was placed. But there is no difference in principle. The statutes governing both boards are essentially the same, in that they manifest the legislative intent to lodge in both bodies as trustees for the people the exclusive custody and control of their properties.

The president of the Board, Hon. R. D. Davis, testified as to the need and desirability of this project and of the purposes and intentions of the Board. We would commend their good intentions and interest in the public comfort and convenience. We appreciate also the civic pride and undoubted interest of a great portion of the people of this enterprising city in obtaining the proposed modern structure and recreational facilities. Nevertheless we are constrained to concur in the opinion of the trial court and to hold that the proposed contracts would not be valid in law.

The judgment enjoined not only the making of the contract but also the enclosing of any part of the park with a structure that would prevent free access to all of it and from charging, collecting or permitting to be charged or collected any fee for admission to a stadium or athletic field in the Park.

The evidence reveals that the Board has no definite plan for erecting the stadium, or financing its erection, other than in connection with the proposed contract. The argument of power and right seems to be only the basis for the claimed authority to make the contract. We think, therefore, the injunction went further than the particular question warranted. It will be time enough to decide the questions of the authority of the Board to erect and operate a stadium when it is presented as an

independent proposition. Therefore, to the extent that the judgment enjoined the making of the contract, it is affirmed; in the other respects it is reversed.